UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

K.R. and S.R. individually, and on behalf of
MATTHEW R., a minor,

                Plaintiffs,

          - against -

THE NEW YORK CITY DEPARTMENT
OF EDUCATION,

                Defendant.

-------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILE[
DOC #:
DATE FILED: 4/20/15

## OPINION AND ORDER

### 13 Civ. 7464 (SAS)

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I. INTRODUCTION

Plaintiffs K.R. and S.R. ("Parents"), individually and on behalf of their minor child Matthew R., bring this action against the New York City Department of Education ("DOE") pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* ("IDEA").[1] Plaintiffs seek review of the July 5, 2013 administrative decision of the State Review Officer ("SRO") reversing

---

[1]    The IDEA was amended by the Individuals with Disabilities Education Improvement Act of 2004, Pub. L. No. 108–446, 118 Stat. 2647 ("IDEIA"). The statutory citations in this Opinion are to the IDEA as amended by the IDEIA.

the August 1, 2012 decision of the Impartial Hearing Officer ("IHO") awarding

reimbursement and/or direct payment of the cost of Matthew's 2011–2012

educational program in a private school.  Plaintiffs move for summary judgment,

seeking an order reversing the SRO decision and reinstating the IHO's award of

reimbursement and/or direct payment.  The DOE cross-moves for summary

judgment, seeking an order dismissing the plaintiffs' complaint in its entirety and

upholding the SRO decision.  For the reasons set forth below, plaintiffs' motion for

summary judgment is GRANTED, and the DOE's motion is DENIED.

## II.   STATUTORY FRAMEWORK AND APPLICABLE LAW

Congress enacted the IDEA "to ensure that all children with

disabilities have available to them a free appropriate public education" ("FAPE")

and "to ensure that the rights of children with disabilities and parents of such

children are protected."[2]  States receiving federal funding under the IDEA are

required to make a FAPE available to all children with disabilities residing in the

state.[3]  "To ensure that qualifying children receive a FAPE, a school district must

---

[2]      20 U.S.C. § 1400(d)(1)(A), (B).  *See also Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239–40 (2009) (discussing the purposes of the IDEA).

[3]      *See* 20 U.S.C. § 1412(a)(1)(A).  *See also M.W. ex rel. S.W. v. New York City Dep't of Educ.*, 725 F.3d 131, 135 (2d Cir. 2013).

create an individualized education program ("IEP") for each such child."[4]  The IEP

"'describes the specially designed instruction and services that will enable the child

to meet' stated educational objectives and is reasonably calculated to give

educational benefits to the child."[5]

New York has assigned responsibility for developing IEPs to local

Committees on Special Education ("CSEs").[6]  The CSE is comprised of the

student's parents, a regular or special education teacher, a school psychologist, a

school district representative, an individual who can interpret the instructional

implications of evaluation results, a school physician, and a parent of another

student with a disability.[7]  The CSE "examine[s] the student's level of achievement

and specific needs and determine[s] an appropriate educational program."[8]

The CSE does not select the specific school in which the student will

---

[4]     *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012).  *Accord Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.2d 195, 197 (2d Cir. 2002) (describing the IEP as the "centerpiece" of the IDEA system).

[5]     *M.W.*, 725 F.3d at 135 (quoting *R.E.*, 694 F.3d at 175).

[6]     *See Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir. 2007).

[7]     *See* N.Y. Educ. L. § 4402(1)(b)(1)(a).

[8]     *R.E.*, 694 F.3d at 175.

be placed, and therefore the IEP does not specify a particular school.[9]  Rather, the DOE provides "general placement information in the IEP, such as the staffing ratio and related services, and then convey[s] to the parents a final notice of recommendation, or FNR[,] identifying a specific school at a later date.  The parents are then able to visit the placement before deciding whether to accept it."[10]

If a parent believes the IEP does not comply with the IDEA, the parent may file a due process complaint with the DOE, requesting an impartial hearing.[11]  Districts are then permitted a thirty-day "resolution period" to address any alleged deficiencies without penalty.[12]  Once the resolution period has run, a parent may continue to a due process administrative proceeding before an IHO.[13]  This decision may be appealed to an SRO.[14]  Either party then has the right to have the SRO's decision reviewed by bringing a civil action in state or federal court.[15]

---

[9]      *See T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 419 (2d Cir. 2009) (holding that an IEP need not specify a specific school site).

[10]      *R.E.*, 694 F.3d at 191.

[11]      *See* 20 U.S.C. § 1415(b)(6).

[12]      *See id.* § 1415(f)(1)(B).

[13]      *See id.* § 1415(f).

[14]      *See id.* § 1415(g)(1); N.Y. Educ. L. § 4404.

[15]      *See* 20 U.S.C. § 1415(i)(2)(A).

The district court "shall receive the records of the administrative proceedings," "hear additional evidence," and "grant such relief as the court determines is appropriate" based on "the preponderance of the evidence."[16]

Parents who believe their child has been denied a FAPE may unilaterally place their child in an appropriate private school and seek tuition reimbursement from the state.[17]  Under the *Burlington-Carter* test, the parents are entitled to reimbursement if "the school district's proposed placement violated the IDEA, (2) the parents' alternative private placement was appropriate, and (3) equitable considerations favor reimbursement."[18]

The first prong of the *Burlington-Carter* test requires the Court to review both the procedural and substantive adequacy of the underlying decision.[19] The procedural inquiry examines "'whether the state has complied with the procedures set forth in the IDEA.'"[20]  The substantive inquiry asks whether the IEP

---

[16]     *Id.* § 1415(i)(2)(C).

[17]     *See School Comm. of Burlington, Mass. v. Department of Educ.*, 471 U.S. 359, 369–70 (1985) ("*Burlington*"); *Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 12 (1993) ("*Carter*").

[18]     *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 152 (2d Cir. 2014).

[19]     *R.E.*, 694 F.3d at 189–90.

[20]     *Id.* at 190 (quoting *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005)).

was "'reasonably calculated to enable the child to receive educational benefits.'"[21]
Procedural violations entitle the parents to reimbursement "only if they 'impeded
the child's right to a FAPE,' 'significantly impeded the parents' opportunity to
participate in the decision-making process,' or 'caused a deprivation of educational
benefits.'"[22]  "Multiple procedural violations may cumulatively result in the denial
of a FAPE even if the violations considered individually do not."[23]  "Substantive
inadequacy automatically entitles the parents to reimbursement."[24]

If the Court determines that either a procedural or substantive
inadequacy denied the child a FAPE, the parents bear the burden of demonstrating
that their alternative private placement was appropriate; that is, whether it is
"'reasonably calculated to enable the child to receive educational benefits.'"[25]
However, parents are "not required . . . to prove that the 'private placement

---

[21]    *Cerra*, 427 F.3d at 192 (quoting *Board of Educ. of Hendrick Hudson
Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206–07 (1982)).

[22]    *M.W.*, 725 F.3d at 139 (quoting *R.E.*, 694 F.3d at 190).

[23]    *R.E.*, 694 F.3d at 190.

[24]    *Id.*

[25]    *Frank G. v. Board of Educ. of Hyde Park*, 459 F.3d 356, 364 (2d Cir.
2006) (quoting *Rowley*, 458 U.S. at 206–07)).

furnishes every special service necessary."[26]  Finally, the parents must demonstrate that the equities favor reimbursement.  "Important to the equitable consideration is whether the parents obstructed or were uncooperative in the school district's efforts to meet its obligations under the IDEA."[27]

A district court must first determine the scope of the issues properly before it for review.  "The party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that were not raised in the notice . . . unless the other party agrees otherwise."[28]  Thus, the scope of the inquiry of the IHO — and therefore of the SRO and a reviewing court— is limited to matters raised in the hearing request or agreed to by the DOE.  However, the Second Circuit has clarified that "the waiver rule is not to be mechanically applied" and the "key to the due process procedures is fair notice and preventing parents from 'sandbag[ging] the school district' by raising claims after the expiration of the resolution period."[29]  The IDEA does not require "that alleged deficiencies be

---

[26]     *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 839 (2d Cir. 2014 (quoting *Frank G.*, 459 F.3d at 365)).

[27]     *Id.* at 840.

[28]     20 U.S.C. § 1415(f)(3)(B).

[29]     *C.F. ex rel. R.F. v. New York City Dep't of Educ.*, 746 F.3d 68, 78 (2d Cir. 2014) (quoting *R.E.*, 694 F.3d at 187 n.4).

detailed in any formulaic manner" and "the waiver rule limits only what may be raised at the due process hearing."[30]  Thus, "arguments not directly raised in a Due Process Complaint [are] not foreclosed" if "(1) the Due Process Complaint 'provide[s] fair notice to the Department of' the argument at issue; (2) 'both the IHO and SRO reach[] the issue on the merits, giving [the federal court] a record for review'; or (3) the argument goes to 'the heart of this dispute.'"[31]

A school district is not required to designate a specific school in an IEP, but nevertheless may not assign a child to a school that cannot satisfy the IEP's requirements.[32]  However, in assessing whether there has been a substantive violation, "[b]oth parties are limited to discussing the placement and services specified in the written plan and therefore reasonably known to the parties at the time of the placement decision."[33]  "[A]n IEP must be evaluated prospectively as of the time it was created.  Retrospective evidence that materially alters the IEP is not permissible."[34]  Further, "[s]peculation that the school district will not adequately

---

[30]    *Id.*

[31]    *C.U. v. New York City Dep't of Educ.*, 23 F. Supp. 3d 210, 223–24 (S.D.N.Y. 2014) (quoting *C.F.*, 746 F.3d at 78).

[32]    *See T.Y.*, 584 F.3d at 420 ("[S]chool districts [do not] have carte blanche to assign a child to a school that cannot satisfy the IEP's requirements.").

[33]    *R.E.*, 694 F.3d at 187.

[34]    *Id.* at 188.

adhere to the IEP is not an appropriate basis for unilateral placement."[35]

There has been some disagreement among district courts in implementing the Second Circuit's holding in *R.E. v. New York City Department of Education.*[36]  Some courts have held that *any* evidence regarding the proposed placement should be disregarded as "retrospective."[37]  Other courts have allowed such evidence "if the alleged defects were reasonably apparent to either the parent or the school district when the parent rejected the placement, regardless of whether [the student] ever actually enrolled . . . ."[38]  All courts appear to agree that a challenge to a proposed placement will be successful where the evidence establishes that the placement would be unable to satisfy the IEP's requirements.[39]

---

[35]     *Id.* at 195.

[36]     *See N.S. v. New York City Dep't of Educ.*, No. 13 Civ. 7819, 2014 WL 2722967, at *12 (S.D.N.Y. June 16, 2014) ("The case law regarding challenges to a school's ability to provide a FAPE is less than a model of clarity.").

[37]     *See, e.g.*, *J.C. ex rel. C.C. v. New York City Dep't of Educ.*, No. 13 Civ. 3759, 2015 WL 1499389, at * 25 (S.D.N.Y. Mar. 31, 2015) ("'[C]ourts are prohibited from evaluating the adequacy of an unimplemented IEP based on evidence about the particular classroom in which a students would be placed.'") (quoting *R.B. v. New York City Dep't of Educ.*, No. 12 Civ. 3763, 2013 WL 5438605, at *17 (S.D.N.Y. Sept. 27, 2013)).

[38]     *Scott ex rel. C.S. v. New York City Dep't of Educ.*, 6 F. Supp. 3d 424, 444 (S.D.N.Y. 2014) (internal quotations omitted).

[39]     *See D.C. ex rel. E.B. v. New York City Dep't of Educ.*, 950 F. Supp. 2d 494, 500–01 (S.D.N.Y. 2013) (holding that the school district failed to offer student a FAPE where the IEP required the child to be placed in a "seafood free

It seems clear, however, that in order to determine if a proposed placement will be unable to comply with a student's IEP, evidence regarding the proposed placement *must* be considered — a categorical ban on *any* evidence relating to the proposed placement would frustrate that inquiry and allow a school district "carte blanche" to assign a child to a school that could not fulfill the requirements of that child's IEP.[40]  Moreover, this is entirely consistent with the holding of *R.E. v. New York City Department of Education*, which concluded:

> We reject . . . a rigid "four corners" rule prohibiting testimony that goes beyond the face of the IEP.  While testimony that materially alters the written plan is not permitted, testimony may be received that explains or justifies the services listed in the IEP. . . . For example, . . . if a student is offered a staffing ratio of 6:1:1, a school district may introduce evidence explaining how this structure operates and why it is appropriate.[41]

Thus, while the IEP must be evaluated prospectively and cannot be *altered* by retrospective testimony about what a school district might have done, testimony

---

environment" and the child's mother was informed on a school visit that the school cafeteria was not seafood free); *Scott*, 6 F. Supp. 3d at 444 (finding a substantive violation where the staff at a proposed placement informed the parent that her child would be enrolled in a class with a 6:1:1 ratio instead of the 12:1:1 ratio required by the child's IEP); *J.C.*, 2015 WL 1499389, at * 24 ("If the assigned school cannot meet the requirements of the IEP, then 'the Department has by definition failed to deliver a FAPE'") (quoting *D.C.*, 950 F. Supp. 2d at 509).

[40]     *T.Y.*, 584 F.3d at 420.

[41]     694 F.3d at 186.

explaining how the IEP would be implemented is sufficiently prospective and may be considered by the Court.

## III.   LEGAL STANDARD

Summary judgment in the IDEA context is a "pragmatic procedural mechanism for reviewing administrative decisions."[42]  The Court's decision is based on the preponderance of the evidence; however, "it must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy."[43]  The Court is "not to make subjective credibility assessments[] and cannot choose between the views of conflicting experts on controversial issues of educational policy in direct contradiction of the opinions of state administrative officers who [have] heard the same evidence."[44]

Where the IHO and SRO reach conflicting conclusions, "reviewing courts are not entitled to adopt the conclusions of either state reviewer according to their own policy preferences or views of the evidence; courts must defer to the

---

[42]   *Id.* at 184 (internal quotations omitted).

[43]   *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009).

[44]   *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 240 (2d Cir. 2012).

reasoned conclusions of the SRO as the final state administrative determination."[45]

However, "the deference owed to an SRO's decision depends on the quality of that opinion."[46]

> '[W]hen the district court appropriately concludes that the SRO's determinations are insufficiently reasoned to merit that deference, and in particular where the SRO rejects a more thorough and carefully considered decision of an IHO, it is entirely appropriate for the court, having in its turn found the SRO's conclusions unpersuasive even after appropriate deference is paid, to consider the IHO's analysis, which is also informed by greater educational expertise than that of judges, rather than to rely exclusively on its own less informed educational judgment.'[47]

Additionally, "determinations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures."[48]

## IV.   REVIEW OF THE ADMINISTRATIVE RECORD

### A.   Underlying Facts

Matthew is a thirteen-year-old boy classified by the DOE as a child

---

[45]   *Id.* at 246.

[46]   *R.E.*, 694 F.3d at 189.

[47]   *Id.* (quoting *M.H.*, 685 F.3d at 246).

[48]   *M.H.*, 685 F.3d at 244.

with autism.[49]  During the 2010–2011 school year, Matthew attended the Rebecca

School, a private school for students with neurologically-based development

disorders, including autism.[50]  On May 24, 2011, a CSE met and generated an IEP

for Matthew for the 2011–2012 school year.[51]  The CSE team consisted of Rose

Fochetta, a DOE school pyschologist; Feng Ye, the district representative/special

education teacher; the Parents; Faina Ibragimora, Matthew's then-current teacher

from the Rebecca School; Lynn Kalvin, a Social Worker from the Rebecca School;

and Adrian Schonr, the Parents' Educational Advocate.[52]  The IEP classified

Matthew as having autism, and recommended placement in a classroom with six

students, one teacher, and one paraprofessional (a "6:1:1 classroom").[53]  The IEP

also recommended that Matthew receive speech and language therapy,

occupational therapy, counseling, and a transitional paraprofessional.[54]  On or

---

[49]      *See* Defendant's 56.1 Statement of Undisputed Facts ("Def. 56.1") ¶ 6; Plaintiffs' Statement of Undisputed Facts ("Pl. 56.1") ¶ 1.  During the 2011–2012 school year at issue in this case, Matthew turned eleven.  Pl. 56.1 ¶ 1 n.1.

[50]      *See* Def. 56.1 ¶¶ 7, 42; Pl. 56.1 ¶ 28.

[51]      *See* Pl. 56.1 ¶ 2.

[52]      *See* Def. 56.1 ¶ 10.

[53]      *See* Pl. 56.1 ¶ 2.

[54]      *See* Def. 56.1 ¶ 11.

about June 11, 2011, the Parents received a Final Notice of Recommendation

("FNR"), offering Matthew placement at P075Q @ Robert E. Peary School

("P75Q").[55]   The Parents visited P75Q in June of 2011 for approximately half an

hour.[56]   On June 17, 2011 the Parents sent a letter rejecting the proposed placement

as inappropriate for Matthew, and informed the DOE that they would keep

Matthew unilaterally placed at the Rebecca School for the 2011–2012 school year

and seek tuition reimbursement.[57]   Tuition at the Rebecca School for that year was

$94,750.[58]

###   B.      The Hearing Officer's Decision

On October 11, 2011, the Parents initiated a due process proceeding

against the DOE, seeking tuition reimbursement and other relief under the IDEA.[59]

The IHO held evidentiary hearings over six days from December 23, 2011 through

June 29, 2012.[60]   The Parents argued both procedural and substantive violations.

*First*, they maintained that they were denied the opportunity to meaningfully

---

[55]      *See id.* ¶ 24.

[56]      *See id.* ¶¶ 36–37.

[57]      *See id.* ¶¶ 39–40.

[58]      *See id.* ¶ 8; Pl. 56.1 ¶ 3.

[59]      *See* Def. 56.1 ¶ 46; Pl. 56.1 ¶ 4.

[60]      *See* Def. 56.1 ¶ 47; Pl. 56.1 ¶ 5.

participate in the development of Matthew's IEP.[61]  They argued that the CSE did

not include all mandated participants because there was no additional parent

member, and that there was no actual discussion at the meeting.[62]  Instead, the

Parents contended that the DOE participants reviewed documents and conferred

between themselves, and then told the Parents what program and services would be

recommended.[63]  *Second*, the Parents argued a substantive violation because the

proposed placement, P75Q, was not appropriate.[64]  They contended that Matthew

would have been inappropriately placed in a class with nonverbal students.[65]  They

also argued that Matthew would not have been able to benefit from the related

services included in his IEP because P75Q provides these services in a small room

with multiple students receiving different services at the same time, and in

hallways and stairwells.[66]  They contended that the IEP and placement at P75Q

would not have met Matthew's academic, social, and emotional needs, and that it

would not have provided him with a FAPE.[67]  *Finally*, they argued that the

---

[61]     *See* IHO Decision at 3.

[62]     *See id.*

[63]     *See id.*

[64]     *See id.*

[65]     *See id.*

[66]     *See id.*

[67]     *See id.*

Rebecca School was an appropriate placement and that the equitable factors supported their claim.[68]

The IHO rendered a decision on August 1, 2012, concluding that the DOE had failed to offer Matthew a FAPE for the 2011–2012 school year, that the Rebecca School was an appropriate placement, and that the equities favored reimbursement.[69]  Therefore, the IHO ordered the DOE to reimburse the Parents for the tuition they had already paid, and to pay the remaining tuition balance directly to the Rebecca School.[70]

With regard to the procedural violations, the IHO noted that there were issues of fact where the testimony of the father and that of Fochetta differed in several respects.  Fochetta testified that there was a full and detailed discussion of all aspects of the CSE's program and IEP recommendations, but stated that she did not have an independent recollection of this particular meeting.[71]  Instead, she based her testimony on her review of documents and her knowledge of the manner in which she and another DOE staff member run all similar meetings.[72]  The father,

---

[68]     *See id.* at 3–4.

[69]     *See* Def. 56.1 ¶¶ 47–48; Pl. 56.1 ¶ 6.

[70]     *See* Def. 56.1 ¶ 49; Pl. 56.1 ¶ 7.

[71]     *See* IHO Decision at 6.

[72]     *See id.*

however, testified that he had an actual recollection of the meeting.[73]  He testified

that the meeting lasted about thirty minutes, that the CSE had only general

discussions and did not go over Matthew's management, academic, physical,

social, and emotional needs.[74]  Nor did the CSE review or discuss Matthew's

annual goals or short-term objectives.[75]  The father testified that the discussions

were between Fochetta and another DOE employee, who discussed things between

themselves and "'shuffled papers,'" but the Parents "'weren't privy to what they

were talking about.'"[76]

      The IHO concluded that she "must give little weight to Ms. Fochetta's

testimony regarding the CSE's discussions and deliberations."[77]  The IHO based

this conclusion on her observations of "the demeanor of both witnesses" as well as

Fochetta's "acknowledged lack of any recollection about the actual CSE

meeting."[78]  Based on the father's "clear and convincing testimony," the IHO

found that the CSE failed to adequately and collaboratively discuss the Student's

---

[73]    *See id.* at 7.

[74]    *See id.*

[75]    *See id.*

[76]    *Id.* (quoting IHO Hearing Transcript ("Tr.") at 268).

[77]    *Id.*

[78]    *Id.* at 7 & n.2.

academic, social, emotional, physical, and management needs at the CSE meeting, and that the Parents were excluded from the discussion and the decision-making process.[79] This failure, coupled with the failure to include a mandated additional parent member as a participant, "significantly impeded the Parents' opportunity to participate in the decision-making process regarding the provision of a FAPE."[80] Thus, the procedural violations constituted a deprivation of the right to a FAPE.[81]

The IHO also addressed the Parents' substantive allegations, and found that the proposed placement at P75Q would not have been appropriate for Matthew.[82] *First*, the IHO concluded that Matthew would "not be provided with sensory input that he needs throughout the school day in order to stay regulated and engaged in classroom activities."[83] *Second*, the IHO determined that Matthew was inappropriately grouped with the other students in the 6:1:1 class, who had very different academic and instructional needs, and were functioning at the pre-K to second-grade level.[84] Further, one of the students in the class was nonverbal,

---

[79]  *Id.* at 7–8.

[80]  *Id.* at 8.

[81]  *See id.*

[82]  *See id.* at 9.

[83]  *Id.* at 10.

[84]  *See id.*

18

which would be "problematic" for Matthew who "is very verbal, but 'doesn't always use his communication skills effectively' and "needs to be 'placed with peers that can . . . model how they're using their verbal communication.'"[85] *Third*, Matthew was to be working on a sixth-grade curriculum during the 2011–2012 school year, but none of the other students in the proposed class were working at that level, and were instead being taught a first-grade curriculum.[86]  Additionally, while Matthew's IEP provided that he would participate in state and local assessments, none of the other students in the proposed class participate in those assessments.[87]  *Finally*, the IHO concluded that the way in which the school provides related services — in one room with multiple students receiving different services at the same time — would be too distracting and would not have met Matthew's needs.[88]  Matthew "would have been overwhelmed and unable to benefit from instruction."[89]  Therefore, the IHO concluded that the DOE had failed to establish that the proposed placement was appropriate for Matthew, and therefore failed to meet its burden of proving that it offered Matthew a FAPE for

---

[85]   *Id.* (quoting Tr. at 259).

[86]   *See id.*

[87]   *See id.*

[88]   *See id.* at 11.

[89]   *Id.*

the 2011–2012 school year.[90]  The IHO then found that the Parents had met their

burden of proving that placing Matthew at the Rebecca School was appropriate,

and that nothing in the record precluded reimbursement on equitable grounds.[91]

### C.     The State Officer's Decision

The SRO first determined that several issues reached by the IHO were

not properly raised by the Parents in their hearing request.[92]  These issues included,

among others, (1) sensory issues, (2) inappropriate grouping in the proposed

classroom, (3) lack of individual instruction, (4) that other students participated in

alternate assessments, and (5) that the other students would not have been

appropriate peers.[93]  The SRO also concluded that the Parents raised several issues

for the first time in their answer to the DOE's appeal, including that (1) the IEP

failed to recommend the specific sensory input Matthew required, (2) Matthew

would not be appropriately or functionally grouped in the proposed classroom

because the annual goals in the IEP could not be implemented and the other

students functioned at a lower level than Matthew, and (3) the proposed classroom

---

[90]     *See id.*

[91]     *See id.* at 11–14.

[92]     *See* SRO Decision at 9.

[93]     *See id.*

was not appropriate because Matthew would only have access to sensory equipment during the provision of his related services.[94]   Because the SRO determined that these issues were not properly included in the Parents' hearing request — and the DOE had not agreed to expand the scope of the impartial hearing — the SRO declined to review them.[95]

On the merits, the SRO determined that the IHO erred in her conclusion that any procedural violation resulted in the denial of a FAPE.  *First*, the SRO concluded that the lack of an additional parent member did not rise to the level of a denial of a FAPE because it did not significantly impede the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE.[96]   The SRO noted that "the IHO does not point to any evidence in the hearing record to illustrate that the parents did not understand the CSE process or that the parents required the assistance of an additional parent member . . . ."[97]   The SRO concluded that because the Parents had their own educational advocate with

---

[94]     *See id.* at 10.  I have not listed the issues noted by the SRO that the Parents have not included in their appeal to this Court.

[95]     *See id.* at 11.  The SRO also declined to review any issues raised in the due process complaint that the IHO did not address.

[96]     *See id.* at 13.

[97]     *Id.* at 15.

them at the meeting, it was "unclear" how an additional parent member could have helped.[98]  *Second*, the IHO determined that the evidence did not support the IHO's determination that the Parents were excluded from participating in the development of Matthew's IEP such that he was denied a FAPE.[99]  The SRO stated that it was "unclear whether [the IHO's] conclusion was based upon a weighing of inconsistent testimonial evidence or upon a finding that the school psychologist's testimony inability [sic] to independently recall [the] specific IEP meeting appropriately formed the bases upon which to make a credibility finding and reject the school psychologist's testimonial evidence."[100]  The SRO then concluded that regardless of the basis of the IHO's conclusion, the evidence in the hearing record "compels a contrary conclusion regarding parental participation" because "[a]n independent review of the entire hearing record indicates that the IEP team discussed the recommended programs and services and annual goals during the meeting, including the student's academic and social/emotional management needs," and that the parents had an opportunity to participate and "were not

---

[98]      *Id.*

[99]      *See id.*

[100]      *Id.* at 16.

22

prevented from participating . . . or from offering their opinions or suggestions."[101] Therefore, the SRO concluded that the parents were afforded a meaningful opportunity to participate.

Substantively, the SRO stated that "it was error for the IHO to reach any of the parents' contentions with respect to the assigned school or how the student's 2011–12 IEP would have been implemented at the assigned school."[102] The SRO noted that "challenges to an assigned school involve implementation claims, and failing to implement an otherwise appropriate IEP may form a basis for finding a denial of a FAPE only where the student is actually being educated under the plan . . . ."[103] The SRO then stated that, even assuming that the student had attended the recommended program, the evidence did not support the conclusion that the DOE would have "deviated from the student's IEP in a material or substantial way that would have resulted in a failure to offer the student a FAPE."[104] The SRO addressed only two of the substantive issues raised by the Parents. Regarding the provision of related services in a shared therapy room, the

---

[101]    *Id.*

[102]    *Id.* at 19.

[103]    *Id.* at 18.

[104]    *Id.* at 19.

SRO concluded that there was no evidence that the environment would have been overwhelming or distracting.[105]   The SRO then concluded that the presence of a nonverbal student in the proposed classroom did not result in the failure to offer Matthew a FAPE.[106]   The SRO stated that the IHO "ignored evidence that the remaining four students in the classroom were all verbal, and the IHO did not address how these four remaining verbal students would not otherwise be able to model verbal communication or maintain a continuous flow of interaction, conversation, and language-based play with the student."[107]   Finally, because the SRO determined that the DOE offered Matthew a FAPE, the SRO did not address whether unilateral placement at the Rebecca School was appropriate or whether the equities favored tuition reimbursement.[108]

## V.    DISCUSSION

### A.    First Prong of the *Burlington-Carter* Test

#### 1.    Procedural Violation

Plaintiffs argue that the SRO improperly overturned the IHO's

---

[105]    *See id.* at 20.

[106]    *See id.*

[107]    *Id.*

[108]    *See id.* at 21.

credibility determinations in his conclusion that the Parents were afforded a

meaningful opportunity to participate in the development of the IEP.[109]  The DOE,

in response, contends that the SRO instead conducted an independent review of the

evidence — namely, the CSE meeting minutes — to find that the Parents had a

meaningful opportunity to participate.[110]  I conclude that the SRO mischaracterized

the IHO's opinion on this issue, and improperly overturned the IHO's credibility

determinations.  Accordingly, no deference is owed to the SRO's opinion on this

issue.

The SRO stated that it was "unclear" whether the IHO's credibility

determination and decision to discount Fochetta's testimony was based on a

weighing of inconsistent testimony or on the fact that she could not recall the

specific CSE meeting.  However, the IHO clearly stated that *both* Fochetta's

demeanor — including the cadence and volume of her speech, hesitations and

pauses, and tone of voice — and the admission that she had no recollection about

---

[109]     *See* Plaintiffs' Memorandum of Law in Support of Cross-Motion for
Summary Judgment at 9–11.  The Parents do not address the lack of an additional
parent member at the CSE; therefore, I decline to review the SRO's conclusion on
this issue.

[110]     *See* Defendant's Memorandum of Law in Support of Cross-Motion
for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary
Judgment at 8–9.

the specific CSE meeting compelled the IHO to give her testimony little weight.[111]
The IHO also noted the father's demeanor, and stated that he "clearly and
convincingly described the nature and extent of the CSE's discussions."[112]  The
SRO was not free to discount these credibility determinations.[113]

Moreover, the SRO's independent review of the meeting minutes does
not "compel a contrary conclusion."[114]  The SRO relied upon the CSE meeting
minutes to conclude that the Parents were afforded an opportunity to meaningfully
participate in the development of the IEP.  However, the SRO's reliance on these
minutes was misplaced.  There was *no* testimony regarding the minutes from any
witness, and thus no basis to determine whether the minutes were an accurate
representation of what occurred at the meeting, whether the minutes were
contemporaneously taken, or indeed, who wrote the minutes.  Without such a
foundation, it was improper for the SRO to rely on the minutes to reject the IHO's
conclusion that the father's testimony regarding what happened at the meeting was

---

[111]     *See* IHO Decision at 7 & n.2.

[112]     *Id.* at 7.

[113]     *See Scott*, 6 F. Supp. 3d at 444; *M.H.*, 685 F.3d at 258 ("The IHO's
determination was based on his assessment of the credibility of the witnesses
testifying before him. . . . It was entitled to deference on that basis.").

[114]     SRO Decision at 16 (citing *M.W. ex rel. S.W. v. New York City Dep't
of Educ.*, 869 F. Supp. 2d 320, 330 (E.D.N.Y. 2012)).

accurate.

The SRO also stated that the IHO did not discuss "conflicting portions of the parent's testimony."[115]  These "conflicting portions" are minimal, at best, and do not compel the conclusion that the father's testimony should be discounted. Rather, the IHO's credibility determination that the father's testimony was clear and convincing merits deference.  The SRO noted two instances of conflicting testimony.  Contrary to the father's statement on direct examination that the Parents did not have an opportunity to participate in the discussion at the meeting, he testified on cross-examination that he and his wife "discussed . . . that the smaller classroom is better for my son in the appropriate setting" and that Matthew required the service of a transitional and/or crisis paraprofessional.[116]  These two instances of participation at the meeting do not undermine the IHO's conclusion crediting the father's testimony that the CSE did not review Matthew's management, academic, physical, social and emotional needs; that no goals or objectives were discussed; or that Fochetta and another DOE employee "discussed things between themselves and 'shuffled papers'; the Parents 'weren't privy to

---

[115]     *Id.* at 17.

[116]     Tr. at 289–293.

what they were talking about.'"[117]  Two examples of participation do not equate to

meaningful participation in the development of the IEP.[118]

Accordingly, I conclude that the SRO's opinion on this issue is not

well reasoned, and therefore not entitled to deference.[119]  The IHO's conclusion on

this issue, by contrast, is well reasoned and based on credibility determinations that

the IHO was in the best position to make.  After a review of the testimony, the IHO

found that

> [T]he CSE failed to adequately and collaboratively discuss the
> Student's academic, social/emotional, physical, and management
> needs . . . .  It also failed to adequately and collaboratively discuss
> program options and recommendations, and annual goals and
> short-term objectives.   I find further that the Parents were
> excluded from the discussion and decision-making process. . . .
> The failure to provide the Parents with the opportunity to actively
> participate in the CSE's deliberations and having two DOE staff
> members    make   programming    decisions   in   whispered
> conversations that the Parents were not privy to . . . constitutes a
> serious procedural violation . . . [which] significantly impeded the
> Parents' opportunity to participate in the decision-making process
> regarding the provision of a FAPE. . . .  Based on the foregoing,
> the DOE failed to meet its burden of proving that it offered the
> Student a FAPE for the 2011–2012 school year.

I defer to the IHO's reasoning and conclusion, and agree that the Parents were

---

[117]  IHO Decision at 7 (quoting Tr. at 268 (testimony of father)).

[118]  *See Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 858 (6th Cir.
2004) ("Participation must be more than a mere form; it must be meaningful.").

[119]  *See R.E.*, 694 F.3d at 189.

denied the ability to meaningfully participate in the development of Matthew's

IEP, which resulted in the denial of a FAPE.[120]

### 2. Substantive Violations

Although the procedural violation satisfies the first prong of the

*Burlington-Carter* test, I will address the alleged substantive violations as well.

Plaintiffs do not raise any arguments in this Court regarding the sufficiency of the

IEP as developed.  Instead, plaintiffs argue that the proposed placement at P75Q

was inappropriate for the three reasons identified by the IHO: (1) inadequate access

to equipment to meet Matthew's sensory needs, (2) inappropriate functional

grouping and curriculum, and (3) related services provided in a group setting.  The

DOE, however, asserts that concerns regarding Matthew's sensory needs and

functional grouping were waived because the Parents failed to raise them in their

---

[120]    The DOE argues that even if the Parents were denied the ability to meaningfully participate in the development of Matthew's IEP, they have not argued to this Court any substantive harm that they suffered as a result of this denial, and they therefore cannot prevail.  The only case the DOE cites for this proposition states quite the opposite: "[P]rocedural inadequacies that individually or cumulatively result in the loss of educational opportunity *or* seriously infringe on a parent's participation in the creation or formulation of the IEP constitute a denial of a FAPE."  *W.S. ex rel. C.S. v. Rye City Sch. Dist.*, 454 F. Supp. 2d 134, 138 (S.D.N.Y. 2006) (emphasis added).  Therefore, the Parents need not allege any substantive harm they suffered as a result of the procedural violation — the statute provides that the fact of the procedural violation, if it significantly impedes the parents' opportunity to participate in the decision-making process, is a harm unto itself that results in the denial of a FAPE.  *See* 20 U.S.C. § 1415(f)(3)(E)(ii).

initial hearing request.  Further, the DOE contends that all concerns regarding the proposed placement are "speculative" and therefore need not be addressed in a case where the student never actually attended the school.  Finally, the DOE argues that even if the concerns were not speculative, the two issues that were not waived — the shared space for related services and the presence of a nonverbal child — would not have prevented the DOE from implementing any of the services listed on Matthew's IEP.

### a.   Access to Sensory Equipment

The SRO concluded that because the Parents did not raise the issue of access to sensory equipment in their hearing request, it would not review that portion of the IHO's decision.[121]  I disagree.  Matthew's sensory issues go to "the heart of this dispute."[122]  Matthew was diagnosed with Sensory Integration Disorder, as noted on his IEP, which states that he requires "sensory tools and sensory breaks," and that he has "[o]lfactory and auditory sensitivities.  He needs preparation for loud noises and he may wear ear plugs. [He requires] [s]ensory breaks and access to a quiet space."[123]  The Parents stated in their hearing request

---

[121]   *See* SRO Decision at 10.

[122]   *C.F.*, 746 F.3d at 78.

[123]   IEP, DOE Ex. 6, at 3–4.

that the proposed placement was inappropriate because, among other things "[t]he classroom environment is too loud, chaotic and stressful for Matthew," which directly relates to Matthew's sensory needs.[124]  Thus, both the IEP and the hearing request directly reference Matthew's sensory requirements.

Moreover, the DOE addressed Matthew's sensory needs in its direct examination of Jennifer Graham, the teacher of the 6:1:1 classroom at P75Q.[125] Thus, the DOE explicitly addressed this issue in its argument that the proposed placement was appropriate.  In light of this, the IHO properly addressed Matthew's sensory needs, including the issue of whether Matthew would have appropriate access to sensory equipment as required by his IEP.[126]

Nor is the issue of access to sensory equipment speculative, as the SRO concluded.[127]  "[T]estimony may be received that explains or justifies the services listed in the IEP."[128]  As discussed above, the IEP sets out requirements for Matthew's sensory needs, and testimony explaining how the proposed

---

[124]     Hearing Request, DOE Ex. 1, at 3.

[125]     *See* Tr. at 123, 125–126.

[126]     *See M.H.*, 685 F.3d at 250–51 (holding that where the DOE "open[s] the door" to an issue, the IDEA does not bar the parents from addressing an issue not specifically listed in the hearing request).

[127]     *See* SRO Decision at 18.

[128]     *R.E.*, 694 F.3d at 186.

31

placement would fulfill these requirements is prospective, not retrospective.[129]

  Although the SRO did not address the issue, the IHO concluded that Matthew "would not be provided with sensory input that he needs throughout the school day in order to stay regulated and engaged in classroom activities."[130]  The IHO found that Matthew "needs to receive sensory input and sensory breaks throughout the day.  Without appropriate sensory input, [Matthew] cannot remain regulated, focused, and engaged in classroom activity."[131]  In other words, the IHO concluded, based on the testimony of P75Q's assistant principal and the special education teacher of the proposed class, that P75Q would be unable to implement the requirements of the IEP, which mandated "sensory tools and sensory breaks."[132]  Because this is an issue requiring "specialized knowledge and educational expertise," and the SRO did not address it, I defer to the IHO's

---

[129] *See Scott*, 6 F. Supp. 3d at 445 ("The proper inquiry for the Court, therefore, is whether the alleged defects of the placement were reasonably apparent to Plaintiff or the DOE when Plaintiff rejected [the placement].").

[130] IHO Decision at 10.

[131] *Id.*

[132] IEP at 3.  This conclusion is not "[s]peculation that the school district will not adequately *adhere* to the IEP . . . ." *R.E.*, 694 F.3d at 195.  Rather, the IHO determined that the school was incapable of implementing the IEP in such a way that would be "likely to produce progress, not regression." *Cerra*, 427 F.3d at 195.

conclusion.[133]

### b.    Functional Grouping

The SRO found that the Parents had not raised the issue of functional grouping in their hearing request, and therefore did not address that portion of the IHO's opinion.[134]  With regard to the *academic levels* of the other students in the classroom, the SRO properly concluded that the issue was waived.  There is nothing in the hearing request that raises the issue of whether the proposed placement would be able to meet Matthew's academic needs, or whether Matthew would be able to benefit from the placement given the differing academic levels between Matthew and the other students in the proposed classroom.  Therefore, the SRO appropriately declined to review this issue.

However, the issue of functional grouping with respect to Matthew's *social and management needs* was properly addressed by the IHO.  The Parents' hearing request states that "[t]he class . . . would not have peer models for Matthew."[135]  The DOE also elicited testimony regarding this issue in its direct questioning of Graham, who stated, "if some of the students are higher functioning,

---

[133]    *M.W.*, 725 F.3d at 138.

[134]    *See* SRO Opinion at 10.

[135]    Hearing Request at 3.

I'll place them together . . . ."[136]  Therefore, the DOE had fair notice that the Parents objected to the placement because of inappropriate functional grouping related to Matthew's social and management needs, and the IHO appropriately addressed this issue.  Further, concerns regarding functional grouping are prospective, not "speculative."  The IEP includes goals related to developing Matthew's verbal abilities, and the alleged defect of inappropriate peer models was apparent to both parties at the time of the proposed placement and relates to whether the proposed placement would have the ability to implement Matthew's IEP.

However, the only evidence related to this claim is the presence of one nonverbal student in the proposed classroom.  As such, the SRO correctly noted[137] that "the weight of the evidence does not support the IHO's determinations regarding this issue.  Specifically, the IHO ignored evidence that the remaining four students in the classroom were all verbal, and the IHO did not address how these four remaining verbal students would not otherwise be able to model verbal communication or maintain a continuous flow of interaction, conversation, and

---

[136]     Tr. at 124.

[137]     Though the SRO erroneously concluded that the issue need not be reached because it related to implementation of the IEP, the SRO discussed this issue, as well as the issue of related services, assuming *arguendo* that Matthew had attended the school.  *See* SRO Decision at 19–20.

language-based play with the student."[138]   I defer to the SRO's well-reasoned

decision on this issue.

### c.   Related Services

Although I conclude, contrary to the SRO, that the IHO properly

reached the issue of the manner in which related services are provided at P75Q, I

agree with the SRO that there is insufficient evidence to support the IHO's finding

that P75Q would have been unable to implement the IEP's requirements or that

Matthew would not have benefitted from these services.   The IHO concluded that

the way the services were provided — multiple students receiving different related

services in the same room at the same time — would not have met Matthew's

needs because it would have been distracting and overwhelming.[139]   However, the

SRO correctly noted that "there is no evidence in the hearing record indicating that

the environment would have been overwhelming or distracting to the student, or

that the student in this case would not have benefitted from related services

delivered in this manner."[140]

In sum, plaintiffs have successfully shown a substantive violation of

---

[138]   *Id.* at 20.

[139]   *See* IHO Decision at 11.

[140]   SRO Decision at 20.

the IDEA with respect to Matthew's sensory needs, in addition to the procedural violation discussed above.  As such, plaintiffs have satisfied the first prong of the *Burlington-Carter* test.

### B.    Second Prong of the *Burlington-Carter* Test

Although the SRO did not reach the issue, the IHO found that the Parents met their burden of proving that unilateral placement at the Rebecca School was appropriate.[141]  The IHO found that the instructional model utilized by the Rebecca School was effective for Matthew, that the program was working with and addressing Matthew's anxiety issues and his socialization and language delays, and that Matthew had been making progress in all domains.[142]  The IHO further rejected the DOE's contention that the Rebecca School was too restrictive, and found that the 9:1:4 class provided Matthew with the individualized instruction and support that he needed to address his academic and social/emotional needs.[143]  The IHO also found, contrary to the DOE's arguments, that the music therapy and play therapy provided by the Rebecca School addressed Matthew's counseling needs.[144]

---

[141]    *See* IHO Decision at 11.

[142]    *See id.* at 12.

[143]    *See id.* at 11–12.

[144]    *See id.* at 11.

36

Because the SRO did not address this issue, and the IHO's opinion on this prong is careful and well-reasoned and relates to matters requiring educational expertise, I defer to the IHO and conclude that the plaintiffs have satisfied the second prong of the *Burlington-Carter* test.

### C.   Third Prong of the *Burlington-Carter* Test

Again, the SRO did not reach this issue, but the IHO concluded that the equities favored reimbursement.  The IHO found that the Parents fully cooperated with the CSE — they made Matthew available for the CSE's evaluation, they participated in the CSE meeting, and they shared documentation with the CSE.[145]  They also provided the CSE with notices regarding their concerns, their rejection of the proposed placement, and their intent to unilaterally place Matthew at the Rebecca School and seek tuition reimbursement.[146]  Further, the IHO found that the Parents would have considered a public school placement if an appropriate placement had been offered.[147]  Though the DOE attempts to mischaracterize the father's testimony in this regard, I agree with the IHO's conclusion that, although the Parents were plainly happy with the education their

---

[145]    *See id.* at 13.

[146]    *See id.* at 13–14.

[147]    *See id.* at 14.

son was receiving at the Rebecca School, they fully cooperated with the school district and appear to have genuinely considered the possibility of sending him to an appropriate placement offered by the DOE. As such, the plaintiffs have satisfied the third prong of the *Burlington-Carter* test.

## VI.   CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment is GRANTED, and the DOE's motion is DENIED. The Clerk is directed to close these motions (Dkt. Nos. 9, 14) and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:   New York, New York
April 20, 2015

38

**-Appearances-**

**For Plaintiffs:**

Lawrence D. Weinberg, Esq.
162 Williamson Avenue
Bloomfield, NJ 07003
(973) 748-3761

**For Defendant:**

Andrew J. Rauchberg
Charles E. Carey
Neil A. Giovanatti
Assistant Corporation Counsel
100 Church Street
New York, NY 10007
(212) 788-0889